IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

Max Obuszewski et al.

Appellant. )
_____ ) No. 06-MJ-00006 (TFH/JMF)

**BRIEF FOR APPELLANT**

Max Obuszewski

FILED
JUL 1 7 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Case 06-mj-00006 (TFH/JMF) Filed 7/17/06

Appellant Max Obuszewski respectfully submits this Brief urging reversal of the judgment of Magistrate Judge Facciola, entered on December 21, 2005, finding appellant guilty of demonstrating without a permit, in violation of 36 C.F.R. § 7.96(g)(2).1

## STATEMENT OF FACTS

Appellant Max Obuszewski is a long-time peace activist and a member of the Pledge of Resistance-Baltimore and the National Campaign for Nonviolent Resistance. He tried to prevent a war with Iraq and continues to act to end the war and occupation. This nonviolent work includes petitioning, protesting, marching and lobbying. He lives a simple pacifist lifestyle, and is indigent.

As a staunch believer in the First Amendment to the U.S. Constitution, the Appellant has repeatedly petitioned her government for redress and sought an end to the Iraq War. He has written articles, letters to the editor and letters to members of Congress.

Since the Bush administration has ignored the largest peace movement in world history, Obuszewski joined with others in requesting a meeting with the Bush administration to discuss and end to the war. When he received no response to his letter, the Appellant went to Pennsylvania Avenue on September 26, 2005 to place the names of a U.S. soldier and an Iraqi civilian on the White House fence.

The criminal charge in this case arises out of this initiative, which was organized by United for Peace and Justice and the National Campaign for Nonviolent Resistance [NCNR]. The Iraq Pledge of Resistance ("IPR"), part of NCNR, in July 2005, submitted applications to the National Park Service ("NPS") for a permit to hold a demonstration near the White House on September 26, for the purpose of peacefully protesting against the Iraq War and to honor those killed in it. As amended, the application included a demonstration on the White house sidewalk. NPS took no action on the amended application, which was therefore deemed granted by operation of the NPS regulations. The National Park Service ("NPS") regulations govern national parks, including various areas around the White House. The regulations provide that "demonstrations and special events" generally may be held on such areas "only pursuant to a permit." 36 C.F.R. § 7.96(g)(2).

In the days leading up to the demonstration, Gordon Clark of IPR communicated by email with NPS officials, including Richard Merryman, regarding details of the upcoming event. Obuszewski did not see the communication until he received Discovery material. On September 23, well after the permit was deemed granted, Clark emailed Merryman and others that he did not want the permit for September 26 to include the White House sidewalk after all. That same day, only three days before the demonstration, NPS issued a written permit, which identified only the Ellipse and Lafayette Park as the designated locations of the demonstration, but also stated that "[c]ivil [d]isobedience [was] also being planned on the White House sidewalk with approximately 300 individuals participating." It did not state that the prior permit had been revoked or specifically address whether the White House sidewalk was no longer a permissible place to demonstrate.

When Obuszewski arrived at Pennsylvania Avenue he was surprised to see that the U.S Park Police installed barriers around the area referred to as the "picture-postcard zone." Hundreds of people were gathered. It seemed the police were intent on enclosing the area when Obuszewski entered to place the names of the dead on the White House fence as part of his right to express his grievance with the government about the Quagmire in Iraq.

After placing the names on the fence, he assisted Cindy Sheehan and other Gold Star Mothers for Peace place photographs and red roses on the fence. He then spent over an hour talking with other First Amendment activists. As suspected, the Park Police closed off the area and began arresting those who were engaged in First Amendment activities.

The Appellant never heard any warnings, as the White House sidewalk became a cramped and festive area. Because of the barriers erected well before Obuszewski arrived, it was now impossible to leave. Anyone remaining to exercise free speech was arrested. However, no officer ever observed anything the Appellant did. He simply joined a processing line and was taken into custody.

After processing, the arrestees were taken unto wagons and delivered to a station in Anacostia. I was released around 3:30 AM on September 27.

The Appellant then appeared before Magistrate Judge Facciola with 24 other defendants in a consolidated proceeding. In a preliminary matter, Prosecutor Harvey indicated that he was amending the charge so that the government would not be seeking jail sentences. This was done so that the Appellant and others who were indigent would be denied a public defender.

Another matter of concern was the government use of "arresting officers." Obuszewski's arresting officer never saw him except during processing. He would have only been able to provide generalized testimony, but unable to attribute specific acts to the defendant. The government argued guilt by association and offered no evidence as to Obuszewski's behavior on September 26. The defendant argued that the evidence was not sufficient to establish that he engaged in unlawful conduct or that he lacked a permit to be there.

Without making particularized findings of guilt as to any individual defendant, Judge Facciola entered a mass guilty verdict. The Appellant was sentenced to a $50 fine plus a $25 fee. Obuszewski then filed this appeal.

## ARGUMENT

### I. The NPS Permit Requirement Is Unconstitutional Because It Imposes Strict Liability on the Exercise of Protected First Amendment Conduct.

The defendant exercised his First Amendment right on a sidewalk which is normally filled with more than 25 tourists. Imposition of strict liability is especially troubling where it touches on the exercise of First Amendment freedoms. If the Bush

administration avoids peace activists, and police agencies keep George W. Bush well away from dissenters, the only option is to gather on the White House sidewalk and hope Bush is looking out the window.

Neither the provision establishing the permit requirement, 36 C.F.R. § 7.96(g)(2), nor the provision defining "demonstrations," *id.* § 7.96(g)(1)(i), requires that a person know that there is no permit before that person may be convicted of violating the regulation. Indeed, the latter provision expressly requires that a person is guilty of "demonstrating" without a permit even if his or her actions have the "effect" or "propensity" to draw a crowd or onlookers, regardless of his or her intent. *Id.* The danger that the regulation will ensnare those who act with no criminal intent is heightened by the fact that small groups of demonstrators, which are normally exempt from the permit requirement, *id.* § 7.96(g)(2)(i), become subject to the requirement if they are adjudged to be an "extension" of another, larger group, *id.*, whose legal status is quite likely unknown to the members of the smaller group. Similarly, a small group of demonstrators unintentionally becomes subject to the permit requirement if enough onlookers choose to join them to make their group larger than 25.

In this case, the Government recognized the plain absence of any *mens rea* requirement in the regulations. Given the undisputed absence in the NPS regulation of any *mens rea* requirement, a person may be held to have violated the regulation by demonstrating without any knowledge as to the lack of a permit, even where the person holds a reasonable, good faith – but mistaken – belief that a permit exists.

The Government presented no evidence to show that Obuszewski or any other defendant knew there was a permit. And given the NPS's failure validly to revoke the permit that had been deemed granted for IPR to demonstrate on the White House sidewalk, or to give any notice of that purported revocation, there is no question that the alleged demonstrators lacked any culpable state of mind with respect to the existence of a permit. Because the NPS regulations impose strict criminal liability without requiring any *mens rea* as to the existence or lack of a permit, the regulations are invalid under the First Amendment

The defendant's conviction was unconstitutional. It is no answer to say that the NPS permit requirement is a mere regulatory violation. Similarly, the relatively lenient penalties provided for in the NPS regulation do not save that regulation from unconstitutionality. In any event, even if this Court were to construe the NPS regulations to require that a person know that she has no permit before she may be convicted of demonstrating without a permit, the Government failed to present evidence that Obuszewski had any such knowledge. Therefore, even if the regulation could be saved from unconstitutionality by construing it to require a criminal intent – which it cannot – Obuszewski's conviction cannot stand.

**II. The Evidence is Insufficient to Prove Obuszewski Was "Demonstrating" Within the Meaning of the Regulation.**

Due process in any criminal trial suggests each defendant is entitled to have his or her case determined from his or her own conduct and from the evidence applicable to him or her. Even where the convenience of the court calls for the trial of several defendants together, guilt remains individual. A court reviews means consideration of whether the evidence particular to the individual defendant establishes every element of the offense as to that individual defendant.

The Government presented no evidence particular to Obuszewski to show that he was demonstrating without a permit. Nor did the court make any particularized findings regarding Obuszewski's or the other defendants' guilt

### A. The Evidence Shows Only That Obuszewski Was on the White House Sidewalk, Which Does Not Constitute "Demonstrating."

In this case, Obuszewski does not dispute on the day of his arrest, hundreds of people had gathered near the White House to express their opposition to the war in Iraq and that many of them were singing, chanting, praying, or otherwise petitioning the government. And he does not dispute that he was at the White House while this activity was underway. Yet these circumstances do not relieve the Government of its burden of proving that Obuszewski himself, by his own words or acts engaged in criminal behavior.

The Government presented no evidence particular to Obuszewski to show that he himself was demonstrating without a permit. Nor did the court make any particularized findings regarding Obuszewski's or the other defendants' guilt

In sum, the evidence and the Government's case against Obuszewski collapses to the contention that simply being on a sidewalk where a demonstration is taking place constitutes "demonstrating." That contention fails. Nothing in the NPS regulations indicates that placing two names of the dead constitutes demonstrating. The regulations define "demonstration" as "demonstrations, picketing, speechmaking, marching, holding vigils or religious services and *all other like forms of conduct* which involve the communication or expression of views or grievances." 36 C.F.R. § 7.96(g)(1)(i). The definition thus does not embrace "all forms" of conduct which involve the expression of views, but instead includes "all *like* forms of conduct" which involve the expression of views; that is, forms of conduct that are "like" the enumerated actions of picketing, speechmaking, marching, or holding vigils or religious services. Those enumerated actions are all proactive, affirmative steps that are inherently expressive.

Even if there were more than 25 people present, the police charged Obuszewski with the wrong offense--a demonstrator carrying a sign or placard must "continue to move along the sidewalk," 36 C.F.R. § 7.96(g)(5)(viii), and stopping while holding a sign would thus constitute a violation of that regulation.

### B. That Obuszewski Expressed Agreement with Those Who Were Demonstrating Against the Iraq War Does Not Make Him a "Demonstrator."

Obuszewski testified he was engaged in Constitutionally-protected speech on September 26, 2005. Mere expression of views, untethered to a form of conduct similar to the forms delineated in the NPS regulations, does not constitute "demonstrating" within the meaning of those regulations.

The need for such a limitation in the definition is clear. One can easily imagine any number of situations in which a person might express a view in a manner that does not approach the traditional understanding of a "demonstration." A pair of tourists who engage in an ordinary conversation about a matter of public policy while strolling on the White House sidewalk are "expressing their views." People debating the wisdom of the Iraq war over lunch or a chess game in Lafayette Park no doubt are "expressing their views." Plainly, to say that any of these people were "demonstrating" would stretch the common understanding of that word beyond recognition. Thus, that Obuszewski acknowledged he was "expressing his views" when on the White House sidewalk – in the absence of any evidence in the record that he was engaged in any conduct identified in the regulatory definition – does not support the finding that he was "demonstrating" within the meaning of the regulation.

Any attempt to define the offense of "demonstrating" by reference to the mere expression of views, unaccompanied by any conduct that amounts to "demonstrating," cannot be sanctioned in light of the important First Amendment principles that limit the government's ability to create a permit requirement in the first place.

. The regulations cannot be interpreted to require that a person who does not engage in a concrete act of "demonstrating" must nonetheless obtain a permit for merely expressing agreement with the views of a group of people who are demonstrating. Such a reading would convert the NPS permit requirement from a reasonable restriction on the time, place, and manner of conducting an actual demonstration into an impermissible content- and viewpoint-based regulation of speech. Indeed, such a reading would permit the conviction of any tourist in the vicinity who wore a T-shirt protesting the war – which clearly is not constitutionally allowed. The regulations' requirement that a person undertake a specific, affirmative act (like marching, picketing, and so forth) in order to be "demonstrating" is therefore essential to the permit requirement's validity. Since the Government presented no evidence that Obuszewski engaged in any such conduct, his conviction cannot stand.

### C. Generalized Evidence That an Undifferentiated Mass of People Were Demonstrating Does Not Support Obuszewski's Conviction.

Rather than introduce any particularized evidence that Obuszewski was "demonstrating," the Government rested its case on a stipulation that the defendant was present on the White House sidewalk on September 26, 2005. The inference the Government hoped to cultivate is that only a demonstrator would have remained on the sidewalk after the warnings.

Other defendants who were tried along with Obuszewski similarly described the

events of the day in their testimony, acknowledging that unidentified members of the crowd were nonviolently engaged in free speech activities; but none of the witnesses stated that he or she saw Obuszewski engage in any such conduct.

For several reasons, this inference does not compensate for the Government's failure to present any particularized evidence that Obuszewski was actually "demonstrating" before his arrest. The definition of "demonstration" in the regulations is necessarily keyed to the conduct of the purported demonstrator, not to his or her mere physical presence at the scene of a demonstration. The regulations specifically distinguish between persons on the scene who are "demonstrators" and those who are merely visitors, tourists, or onlookers. 36 C.F.R. § 7.96(g)(1)(i). Indeed, the regulations contemplate that a demonstration is likely to attract onlookers, *id.*, and whether they pause to observe out of a sense of solidarity with the demonstrators or out of idle curiosity, those onlookers plainly are not themselves "demonstrators" just because they happen to be standing (or sitting) nearby. In addition, there are a host of reasons why a person who is not "demonstrating" might be found in the area of a demonstration, even after a warning to disperse is given. A person who was not demonstrating might have thought he was not the target of the order to disperse, precisely because he was not "demonstrating." Or, the same curiosity that attracts an onlooker to the scene of a demonstration in the first place would likely incline the person to stay and observe a mass arrest. Or, in this case, there was testimony from multiple witnesses that they did not hear the warnings due to other noise. Further, given that the police erected barriers around all but the west end of the long sidewalk before issuing warnings, it is highly likely that some people within the perimeter thought they were already trapped.

There was no egress, even before police closed off the west end and began arrests. The Government's assumption that all persons who remained on the sidewalk after the warnings were necessarily "demonstrators" is thus pure speculation and cannot substitute for record evidence that Obuszewski was in fact "demonstrating" prior to his arrest.

The Government's attempt to premise Obuszewski guilt upon the assumption that anyone who happened to be present at the demonstration must have engaged in criminal activity, despite the complete absence in the record of any individualized evidence of such conduct, bears striking resemblance to the police conduct the D.C. Circuit recently rebuked in *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006). In that case, the D.C. Metropolitan Police Department, responding to a demonstration in Pershing Park in northwest Washington, cordoned off the perimeter of the park without warning and arrested everyone within the perimeter.

The court of appeals concluded, in the absence of particularized probable cause as to each person in the park, the assistant chief who ordered the arrests had shown no "objective basis for arresting the entire mass of people who happened to inhabit the park."

In sum, the totality of the Government's evidence concerning Obuszewski's conduct on the day of the arrest establishes that he was on the White House sidewalk. And he explicitly testified that he was not demonstrating, but engaging in free speech. Given this

lack of evidentiary support for the charge, no rational arbiter of fact could have found beyond a reasonable doubt that Obuszewski was "demonstrating" without a permit on the White House sidewalk. The conviction must therefore be reversed.

**III. The Evidence Was Insufficient to Prove Obuszewski Demonstrated "Without a Permit."**

Even assuming the Government established that Obuszewski was "demonstrating" on the White House sidewalk – which it did not – the Government would still have to show that there was no permit for the activity. The evidence shows, however, that Obuszewski was required to obtain a permit only if he was an "extension" of a larger group of protesters.

. But groups of 25 persons or fewer are exempt from the NPS permit requirement, unless the group is "merely an extension of another group already availing itself of the 25-person maximum." 36 C.F.R. § 7.96(g)(2)(i). Since no evidence was presented that Obuszewski arrived on the sidewalk with more than 25 people, he was required to have a permit only if he and his group were "merely an extension" of another group that was demonstrating there.

Because the evidence is not sufficient to show, beyond all reasonable doubt, that IPR did not have a valid permit to demonstrate on the White House sidewalk, the evidence is not sufficient to support Obuszewski's conviction. The NPS regulations provide that all applications for permits to demonstrate are deemed granted unless denied within 24 hours of receipt. 36 C.F.R. § 7.96(g)(3).. Once a permit is deemed granted by operation of this rule, the NPS Regional Director may revoke the permit prior to the demonstration, but must do so in writing and only upon a specific ground for which an application would be subject to denial in the first instance. 36 C.F.R. § 7.96(g)(3), (g)(6).

In fact, although the written permit issued on September 23 identified only the Ellipse and Lafayette Park as the designated location of the demonstration, nothing in that permit purports to revoke the previously issued permit for the White House sidewalk that had been deemed granted months earlier. *See* Gov't Ex. 1. Nor does it recite any reason for revoking that previously issued permit, even though the NPS regulations require such a revocation to be in writing and to be based on a specific ground enumerated in the regulations. 36 C.F.R. § 7.96(g)(6). To the contrary, the written permit identified the White House sidewalk as the location of some of the planned activities. *See* Gov't Ex. 1. Given that the written permit says nothing about revocation and cites no basis for revocation, it was not a valid revocation under the regulations. 36 C.F.R. § 7.96(g)(6). And since the permit for the White House sidewalk thus was not properly revoked, the arrestees were not demonstrating "without a permit." Revocation could be appropriate when an applicant wishes to cancel or change the content of an existing permit.

The regulations nonetheless require the revocation itself to be in writing and to specify the grounds for revocation, 36 C.F.R. § 7.96(g)(6), and there is no exception to that requirement for revocations based on the request of the applicant. It is therefore irrelevant whether the email message clearly communicated its author's desire to remove the White

House sidewalk from the scope of the IPR permit; what is controlling is whether the NPS issued a valid, written revocation removing the White House sidewalk from the extant permit. Here, there was no such revocation.

Lacking the guidance of a clear, written revocation, none of the alleged demonstrators had any notice as to the lack of a permit. And since the written permit issued on September 23 said nothing about revoking the permit for the White House sidewalk, it could not have provided notice to participants that there was no permit for the White House sidewalk. *See* Gov't Ex. 1. By failing to comply with the requirement that revocations be made in writing, subject to specific standards, NPS failed to give anyone covered by the IPR permit the necessary fair notice that their conduct was forbidden.

Compounding the absence of any notice of the purported revocation, other factors at play on the day of the demonstration left participants with no indication that their activities on the White House sidewalk were unlawful. Most notably, the police never directed demonstrators not to go onto the sidewalk. To the contrary, the police established a friendly and professional rapport with the activists, allowing them to present their petitions and engage in a "festive" atmosphere on the White House sidewalk for several hours and at times helped them to obtain food and water from others in Lafayette Park.

This conduct was consistent with the general policy of the Park Police not to shut down peaceable First Amendment assemblies in the absence of a violation of law that is unrelated to the existence or lack of a permit. The ambiguity surrounding whether the IPR permit covered the White House sidewalk raises particular concerns from a Due Process perspective.

In sum, there was no dispute that a permit to demonstrate on the White House sidewalk was deemed granted. The Government failed to establish, beyond a reasonable doubt, that the permit was validly revoked in a manner consistent with the regulations and that sufficient notice of the revocation was given to the participants. And the Park Police acted as if there was a permit, right up until they issued warnings and instructions to leave. Therefore, even assuming that the Government presented any evidence to show that Obuszewski was "demonstrating" within the meaning of the NPS regulations – which it did not – the evidence was not sufficient to establish that he was demonstrating "without a permit."

**CONCLUSION**
For these reasons, this Court should reverse the judgment of conviction.

Respectfully submitted,
Max Obuszewski